27477. HODGES *v.* ASHURST & DENNIS *et al.*

DECIDED MAY 12, 1939. REHEARING DENIED JUNE 1, 1939.

*Douglas, Andrews & Cole, J. E. Feagin,* for plaintiff.

*D. D. Veal, P. J. Riordan,* for defendants.

SUTTON, J. Mrs. H. R. Hodges brought suit for damages against Ashurst & Dennis, a partnership, and Eatonton Oil & Auto Company, a corporation, alleging that on February 26, 1937, she purchased from the retailer defendants, Ashurst & Dennis, two gallons of kerosene which they had bought from the defendant corporation; that she put a portion of the kerosene in her cooking-stove and lit the same in the ordinary manner, left the kitchen momentarily, and that as she returned to the kitchen an explosion occurred, injuring her in described particulars; that the kerosene sold her had a flash point of 90 degrees Fahrenheit; that the sale of the same to her with such a flash point was in violation of the law of this State, which requires a minimum flash point of 115 degrees Fahrenheit; and that such violation of the law was negligence per se, proximately causing her injuries. The jury returned a verdict in favor of the defendants. The plaintiff filed a motion for new trial on the general grounds, and by amendment added several special grounds, all of which are dealt with hereinafter. The exception is to the judgment overruling the motion for new trial.

The evidence on the trial of the case was substantially as follows: The plaintiff testified that she purchased two gallons of kerosene from Ashurst & Dennis on February 26, 1937, and about noon on the following day lit her oil stove to fix lunch for her little daughter; that she saw that the tank was about dry, and thereupon filled the same with the kerosene she had bought, and stepped back out of the door to get her broom to sweep the kitchen; and that just as she went back in an explosion occurred, and she was blinded from the smoke and heat. She further testified: "I did not leave the tank open after I filled it, but put the cap on it as usual, and turned it down in the place it goes. It was turned down tight when I got through. I then went outside for my broom, and as I came back in is when I got burned. . . There was flame, the best I can remember, it seemed like the whole room was afire. Just as I opened the door there was a terrible noise; it sounded like everything was going to pieces in the kitchen. I

rushed right out as soon as I could get out and feel my way out of the kitchen, and I just hollered for help because I didn't think of anything except myself right then, because I was burning so bad, and I couldn't see. My face and eyes were burned at that time. I could not see at all right then. I believe I called Mrs. Rainey across the hall to call the fire department later. Mrs. Edwards came to me. I was on the back porch during the time when she got there. I consulted a physician as soon as Mrs. Edwards could carry me down there. She took me to Dr. Clodfelter, a doctor here in Eatonton at the time, but I don't remember his initials. . . He put medicine in my eyes and treated my face, and also gave me a prescription to the drug-store for medicine for my eyes. I don't remember what the doctor gave me, but he gave me two kinds of medicine. I don't remember exactly how many times I went to Dr. Clodfelter or just how long he treated me. I went to him three or four times. He sent me to Dr. Aldridge in Macon, who is supposed to be an eye doctor. I went to Dr. Aldridge three or four weeks. . . He treated my eyes but I don't know exactly how he treated them. I did not wear glasses before this accident took place, but put them on under Dr. Aldridge. . . I have to wear them when I am up, practically all the time."

Dr. T. C. Clodfelter testified, that he is not now engaged in private practice, but in February, 1937, Mrs. Hodges came to him, complaining of her eyes and face; that he found she had conjunctivitis, an irritation of the membrane of the eye, which can be caused from smoke, flames, or fumes, but from any irritant, systemic condition, or indigestion; that he gave her some treatment, but can not be positive what it was, has no recollection of length of time he treated her or how many visits she made, does not remember whether he or she suggested a specialist, he not being one, but she informed him after a few days that she had been to Dr. Aldridge in Macon; does not remember that she had any blisters on face or that her eyebrows were singed, and "didn't see any sign at all that indicated her condition was caused by an explosion; only just that conjunctivitis and her face was somewhat red;" did not give treatment for severe burn; might have put something on her face, but did not bandage it; never saw any exterior effect of any flame on her eyeball; and that an amount of

heat that would not cause a burning or scalding of the surface of the eyeball would have no effect on the muscles back of it.

W. E. Edwards testified that he was with H. R. Hodges, husband of the plaintiff, when he took a sample of kerosene from the can in the kitchen and put it in a jar for sending to Atlanta by express for inspection; that a few days after the accident he was with Hodges when he discussed with C. W. Dennis Jr., a member of the partnership of Ashurst & Dennis, the facts of the accident; that Dennis said, "I told that boy when he put that kerosene in there that it smelled more like gas than it did kerosene;" that witness went in the kitchen after the alleged explosion, and the oil stove was not torn to pieces, just looked like it had been burned; that it was located in the far corner from the door of the kitchen or close to the wall; that the curtains were burned and the walls and ceiling blistered; and that he saw signs of fire, but did not know what caused it.

Bill Gearhart testified that in February, 1937, and for some time theretofore he was employed by Eatonton Oil & Auto Company as a driver of a tank truck to and from Savannah, and would get a load of kerosene or gas, carrying only one or the other on each trip; that when "I got back to Eatonton on the truck I dumped it by draining it out of the pipe. There was one drain-pipe attached to each compartment of the tank, under the bottom. . . After we drained it we would not do anything else to the truck or tank. We never went inside the tanks with a mop or broom or anything of that kind, to clean them out. My truck was never mopped out for hauling gasoline, nor swept with a broom, nor washed out with any fluid other than kerosene or gasoline, that I know of. . . The Wofford Oil Company [from whom purchases were made in Savannah] would always look in it before they would load it; if there was anything at all in there they would drain it free. . . The Wofford or Purol people never cleaned or mopped out the tanks on my truck while I was at Savannah loading up. Most of the time they would run kerosene through to wash the gasoline out when they wanted to send a load of kerosene. . . When I come to Eatonton I dump kerosene into the kerosene tank, and have a different tank in which to dump gasoline. There is no possible chance that I know of for gasoline to get in the kerosene from Savannah up here."

Mrs. W. B. Edwards testified, that upon hearing the fire bell ring she went to Mrs. Hodges' home and found her standing near the kitchen door; that she said she thought her eyes were ruined, and her face was smutty and red; that there was still a great deal of smoke in the kitchen and evidence of fire having been there; that she led Mrs. Hodges to her bedroom and washed her face and doctored it the best they knew how until that afternoon when she went with her to Dr. Clodfelter; that she drove Mrs. Hodges in her car and that, beyond being a little uncomfortable, she was sitting like a normal person; that she did not remember what the doctor did for her, but he gave her a prescription and eye medicine and salves which she used from time to time on her face and around her eyes; that her skin was red, almost blistered, and her eyes were red and her eyelashes and eyebrows singed, and later she had pus in her eyes; and that she made several trips with Mrs. Hodges to Macon to see Dr. Aldridge.

H. R. Hodges, husband of the plaintiff, testified, that he brought the stove in question from Lake City, Florida, about two months before the accident; that he reached home about 5:30 in the afternoon of the accident, and found his wife in her bedroom, not in bed, but sitting up, looking "pretty tough," smutty and real red in the face, and her eyes running water; that he went in the kitchen and everything was "messed up and smutty," walls blistered, curtains burned, tank from the stove lying on the floor, the handle melted off, and the oven bent; that he is using the stove in his restaurant in Lake City every day, having fixed it, putting in new burners; that he took the remainder of the kerosene, got a jar, about a pint or half pint in size, screwed the top on, left it at the express office for shipment to Atlanta for test, and later received report from Dr. S. H. Wilson, State Oil Chemist; that before putting the kerosene in the jar he rinsed it well; that after receiving the report he showed it to Mr. Dennis of the partnership of Ashurst & Dennis, and he said "I told Mr. Wallace when he was putting that kerosene in the tank that morning that it smelled like gasoline to me. I said it was too strong for kerosene;" that Mr. Edwards was with him at the time; that of the two gallons of kerosene not put in the stove tank and not put in the jar, the rest was used in starting fires in the grate in his front bedroom; that it exploded, but did not hurt anybody, when a match was put to

it; that he still had one quart which he was holding as a souvenir; that he thought there was a little kerosene in the oil-stove tank when he washed it out and put in fresh oil, and the explosion must have got the kerosene out of the tank through the stopper which was off; that the kerosene was all burned out of the bases of the burners; that he did not ask C. W. Dennis that he and the witness get together and sue the Eatonton Oil & Auto Company; that he had bought kerosene from Ashurst & Dennis a couple of months before the accident and had never had any trouble with it, and had had no further trouble with the stove which was being used every day in his restaurant.

A. J. Dorkins, express agent at Eatonton, testified that he sent to Atlanta the jar of kerosene brought in by H. R. Hodges.

C. W. Dennis Jr. testified, that he was a member of the partnership of Ashurst & Dennis, and in February, 1937, was operating the grocery store from which Mrs. Hodges bought the two gallons of kerosene; that they bought kerosene from the Eatonton Oil & Auto Company exclusively; that it was brought to their place of business in a truck and there stored in a 60-gallon tank in which nothing was stored but kerosene; that H. R. Hodges came to him and wanted his firm to go in with him and sue the Eatonton Oil & Auto Company, and he informed Hodges that he would not do so; that he did not tell him that the kerosene of which Mrs. Hodges purchased a part smelled like it had gasoline in it; that he sold from 35 to 50 gallons per week, and had never had any complaint except from Mrs. Hodges, and had never heard of any other explosion in the entire city of Eatonton; that he had 35 or 40 gallons at the time he sent the two gallons to Mrs. Hodges, and sold the remainder to customers there.

Frank A. Dennis testified, that he was president and manager of Eatonton Oil & Auto Company, the average output of their kerosene being two to three thousand gallons per month, and that once a month, sometimes twice a month, he would send a truck to Savannah for kerosene; that after it was received it was unloaded from the truck into a kerosene storage tank by the railroad-track, and then drawn out into a delivery truck and sold to merchants in Eatonton and Putnam County; that he never had a complaint on the kerosene which was purchased exclusively from Wofford Oil Company at Savannah, that the storage tank above mentioned is

altogether separate from other tanks used by his company, the pipe line is separate, and the kerosene is got out of the tank through the pipe line through which it entered the tank; that it does not come in contact with the gasoline pipe line; that a delivery truck is used for kerosene, and is thoroughly drained of all gasoline whatever when the gasoline tank compartment has been used for transporting gasoline, and is cleaned as thoroughly as possible.

D. D. Salter testified, that he was employed in loading trucks of oil in Savannah for Purol Company which supplies Wofford Oil Company with kerosene and gasoline; that he loaded trucks of Eatonton Oil & Auto Company at that point; that when these trucks come to him the first thing he does is to take a flashlight and open the dome and inspect the truck thoroughly; that in the meantime the driver opens the outlet valve; that by means of a 3-inch hose connected to a 20,000-gallon tank of pressure, and to the truck tank compartments, the compartments are flushed by pressure, so that there is no chance for the kerosene to be contaminated by gasoline if there is any slight quantity or drainage of gasoline left in the compartments of the truck upon arrival at Savannah; and that the tanks were flushed with kerosene before they began the loading of the kerosene for sale.

Tom Resseau testified, that he had been running a store out in the country, had been using 30 or 40 gallons a month of kerosene from Eatonton Oil & Auto Company, and had never had any complaint from it, and had been buying from them for about 16 years.

W. I. Waller testified, that he ran a filling-station and had been buying kerosene from Eatonton Oil & Auto Company for about nine years, selling 90 to 100 gallons of kerosene per month, and neither during 1937 nor at any other time had he ever had any complaint as to it being less than the legal standard or contaminated with gasoline or having any other dangerous properties.

Willie Brown testified, that on February 27, 1937, he was working for Mr. Rainey, and had occasion to go to Mrs. Hodges' apartment which was in the same house occupied by Mr. Rainey and his wife; that he was delivering some kerosene to them at the time of the fire in Mrs. Hodges' kitchen; that Mrs. Rainey told him to go in and see what was the matter; that some smoke was coming out; that he opened the kitchen door and went in, and the smoke was so strong he could not stand it, and at that time Mr. Marshall

came in and the witness went out, and Mr. Marshall went in and put it out, that being in Mrs. Hodges's kitchen right across in front of Mrs. Rainey's kitchen; that Mrs. Hodges was not there when he went in the kitchen; that she came after the fire bell rang and while he was on Mrs. Rainey's back porch and had already been in the kitchen and Mr. Marshall had put out the fire; that when he went in the kitchen nothing was burning except the stove, although the walls were getting pretty hot; that the fire was down where the stove burner had blazed up, and smoke was coming out through the top of the lid like a wood stove; that he does not know whether or not Mrs. Hodges showed any sign of having been burned; that he just saw her standing on the back porch; that the first time he saw the inside of the kitchen the walls were blistered and the stove was pretty close to the wall, not too close, but off a little piece, and the wall that was blistered was the one right back of the stove, and the room was filled with smoke, and he could not say whether or not the curtains were burned, as he did not pay that much attention.

C. W. Preston testified, that he saw Mrs. Hodges when she came down to the place of business of Ashurst & Dennis a short time after the fire, a day or two; and that she was not wearing glasses, and was driving a Chevrolet car, and no one was with her.

George Kilpatrick testified, that he was in the Hodges kitchen when the fire was being put out, and did not see her anywhere around there until after the fire; that there was a blaze in the stove, down in the flue, and it was just puffing smoke; that he assisted others in putting out the fire in the kitchen by throwing rags and rugs, and did not see any sign of an explosion; that the stove was still burning, just like a lamp that was turned up too high, and was giving off black smoke; that the oven was knocked off when things were thrown on the stove; couldn't say who did it, but he heard it hit the floor, and looked and saw it; that Mrs. Hodges came out and stood on the porch and talked; that she looked like she was scared, her face was kind of red like she was scared, but that he did not know about her eyes being red and did not notice her eyelashes, did not notice anything wrong with them; that she stood and talked there with Mrs. Edwards about the fire.

J. L. Ashurst testified, that he was a member of the firm of Ashurst & Dennis, and for about four years had sold gasoline and

kerosene purchased from Eatonton Oil & Auto Company, and had never had a complaint except from the Hodges; that he knew Mrs. Hodges, and saw her driving a car after the accident, two or three days after the accident.

Iola Goolsby testified, that she was cooking for Mrs. Rainey when Mrs. Hodges' stove caught fire, Mrs. Hodges' kitchen being right across from the Rainey kitchen; that she had finished cooking and was about ready to go home, and heard Mrs. Hodges walking down the hall, and when the door slammed she cried "Help!" and the witness went to the door, and smoke was just coming out under the door of the Hodges kitchen; that the door that slammed was the little hall door where Mrs. Hodges comes out on the porch, and was closed before Mrs. Hodges came out on the porch; that the witness looked out, and Mrs. Hodges was standing there, wringing her hands; that if she went in the kitchen the witness does not know anything about it, and does not know whether or not Mrs. Hodges had smoke all over her face, as she did not pay attention to her, but knows smoke was coming out of the kitchen; that she does not know whether or not Mrs. Hodges was in her room or not, but that she came down the hall to go in her kitchen and hollered "Help!"

Allen Marshall testified, that his sister, Mrs. Rainey, called him and informed him the house was on fire; that he went there, and on arrival saw smoke in Mrs. Hodges' kitchen, coming out of the door; that he went in the kitchen, and some one else was in there, but he did not see Mrs. Hodges until he came out, and she was standing on the porch; that he did not notice anything wrong with her face, and she did not show any signs of having been in smoke or fire; that he could not state whether there had been an explosion in the kitchen, but that there was a little blaze down around one of the burners of the stove when he got in the kitchen; that the curtains were not burning when he saw them, but the room was filled with smoke; that he did not see any signs of an explosion; that he worked in a grocery store which sold kerosene supplied by Eatonton Oil & Auto Company, and had never heard of any complaint from it except in the Hodges case.

J. P. Gardner testified that he was a merchant in Eatonton, and had been selling about 60 gallons of kerosene per week for five or six years, purchased from Eatonton Oil & Auto Company, and

was obtaining kerosene from them in February, 1937, and had never heard of any explosion or had any complaint from such kerosene.

Dr. S. H. Wilson, State Chemist, testified, that he examined the sample of kerosene sent in by H. R. Hodges, and found its flash point to be 90 degrees Fahrenheit; that in his opinion a liquid or oil with a flash point that low is dangerous for use in an oil-burning stove; that there would be a slight degree of contamination in hauling kerosene in a compartment from which gasoline had been drained, unless it was thoroughly dried out, but he did not think there would be sufficient vapor remaining to lower the flash point of the kerosene to 90 degrees Fahrenheit.

1. While the testimony of the plaintiff made out a prima facie case for recovery of damages in some amount, evidence introduced on behalf of the defendants made an issue for the jury as to whether the alleged explosion had been caused by defective kerosene or by a condition of the stove. The evidence as to the care taken by the distributors of kerosene in Savannah, and by the dealer and the retailer in Eatonton, to prevent contamination by gasoline, which, as claimed by the plaintiff resulted from the methods employed, was sufficient to authorize the jury to find that there had been no appreciable contamination; and the testimony of the State Chemist was to the effect that, although there would be a slight degree of contamination in hauling kerosene in a compartment from which gasoline had been drained, unless it was thoroughly dried out, he did not think there would be sufficient vapor remaining to lower the flash point to 90 degrees Fahrenheit, notwithstanding that the sample sent him showed such a distillation test. Furthermore, the physical evidence in the kitchen would support a conclusion by the jury that the smoke, flame, and heat in the kitchen of the plaintiff resulted only from a condition of the burners, brought about by the manner in which the plaintiff ignited the oil for cooking purposes. It is significant that, aside from the necessity of replacing the burners, the stove was not appreciably damaged, and that even so fragile a thing as the glass tank in which the kerosene was contained was not broken by the alleged explosion. It is further significant that the kerosene sold by the dealer and the retailer, of the same kind purchased by the plaintiff, in the manner in which it was hauled, stored, and re-

tailed, to the extent of many thousand gallons and covering a period of several years, had given no cause for complaint as to it being below the legal standard of safety; and that part of the two gallons purchased by the plaintiff was, after the alleged explosion and injury to plaintiff, used with perfect safety in her bedroom for lighting fires. According to the testimony of the plaintiff, when she entered the kitchen with her broom she was so affected by the heat, flame, and smoke that she was almost blinded, and her eyes and face were burned, but she managed with difficulty to feel her way out, and she called to Mrs. Rainey to summon the fire department; and it was necessary to undergo treatment by a physician at Eatonton and by a specialist at Macon. The Eatonton doctor remembered only that he treated her for conjunctivitis, and that her face was somewhat red, testifying that conjunctivitis was an inflammation of the membrane on the inner side of the eyelid, but it could be caused by any irritant, as well as by smoke or heat, and that he "didn't see any sign at all that indicated that her condition was caused by an explosion;" and while the plaintiff testified that because of her injuries she had been forced to wear glasses ever since, the physician testified that an amount of heat that would not cause a burning or scalding of the surface of the eyeball would have no effect on the muscles back of it. There was no testimony from the specialist whom the plaintiff and her witness, Mrs. Edwards, said it had been necessary for the plaintiff to be treated by on several occasions in Macon. We think that, assuming that there was some kind of an explosion and that the plaintiff was actually injured as she entered the kitchen in the manner detailed by her, it could not be said as a matter of law that the jury was not authorized from all the evidence to return a verdict in favor of the defendants.

Counsel for plaintiff contend that her testimony that an explosion occurred while she was in the kitchen is not disputed by any witness; and that while the evidence perhaps did not show that she was injured as seriously as alleged in her petition, she is entitled to damages in some amount. It is apparent from reading her testimony as a whole, however, that she did not pretend to assert that she actually witnessed an explosion from kerosene. She first testified that there "must" have been an explosion, but upon further examination she stated that an explosion did occur. She gave no

facts which would require a holding, as a matter of law, that the kerosene itself was the direct and contributing cause of what she termed an explosion. Her testimony, properly construed, merely shows that, because of certain conditions which she encountered on opening the kitchen door, she *concluded* that an explosion of the kerosene had taken place. Assuming that there was an explosion, the evidence of several witnesses as to the condition of the burners of the stove made an issue for the jury as to whether the explosion was caused by defective kerosene or defective parts of the stove, notwithstanding the plaintiff's evidence that theretofore the stove had not been out of order.

2. In the first special ground of the motion for new trial it is contended that the charge of the court as to the standard of kerosene, as required by law, for cooking purposes, was such as to confuse the jury and lead them to believe that the requirement is that the *temperature* of the kerosene shall not be less than 115 degrees Fahrenheit, whereas, under the Code, § 73-216, and the regulation issued by the comptroller-general in pursuance of the authority vested in him by the statute, the law is that such kerosene shall be of such distillation test that it will not flash, that is, give off vapors, upon being heated, which when mixed with the air would cause an explosion, at less than 115 degrees Fahrenheit. In the second special ground it is contended that the court failed to properly instruct the jury, in respect to the flash point of kerosene, as to the standard required by law of kerosene for cooking purposes. While it does not appear from the record that there was any evidence, aside from the statement of the State Chemist, that the comptroller-general had by regulation provided that kerosene for cooking purposes shall be of a flash point of 115 degrees Fahrenheit, the case seems to have been tried on that theory; and an examination of the charge discloses that while the judge first inaccurately charged the jury in the premises, upon his attention being called to the error he made prompt and sufficient correction, and substantially charged as to the law applicable, and no cause for new trial appears in these grounds of the motion.

3. The third special ground complains that the court erred in charging the jury: "The defendants contend, as I told you, in the first place, they contend that the plaintiff was not injured by the explosion, and that she was not in the kitchen at the time; and

they claim that she was not injured at all. That is a question of fact for your consideration." It is contended that there was no evidence supporting such contentions, and that the evidence demanded a finding that the plaintiff was injured by the explosion of kerosene in the kitchen at the time of the explosion. This ground is without merit. A servant in a near-by kitchen testified that as she was about to leave the premises she heard the plaintiff walking in the hall of the house in which the plaintiff had an apartment, heard the hall door slam, and looking in that direction saw the plaintiff as she came out of the door and, while wringing her hands, holler "Help!" The witness then saw smoke coming from the plaintiff's kitchen, but did not know whether or not the plaintiff entered the kitchen. The plaintiff denied that she came down the hall and saw the smoke coming from the kitchen at the time testified to by the witness; and testified that she did not then holler for help, and that she "was in the kitchen." We think that the witness's testimony was sufficient to raise the issue whether or not the plaintiff had in fact been in the kitchen at the time of the alleged explosion. If the witness's testimony be true, the jury would be authorized to find that the alleged explosion had already occurred when the plaintiff emerged from the hall door in the rear of the house, and that the plaintiff had not been injured as claimed.

4. The court did not err, for any reason assigned in the motion for new trial, in refusing to permit the plaintiff to prove that she suffered at intervals from headaches, there being no allegation in the petition to authorize the introduction of such evidence.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*